McMAHAN & COMPANY; Froley, Revy Investment Co., Inc.; Wechsler & Krumholz, Inc.; and Don Thompson, on behalf of himself and all others similarly situated, Plaintiffs–Appellees,

v.

WHEREHOUSE ENTERTAINMENT, INC.; Louis A. Kwiker; George A. Smith; Michael T. O'Kane; Lawrence K. Harris; Donald E. Martin; Joel D. Tauber; Furman Selz Mager Dietz & Birney, Inc.; WEI Acquisition Corp.; WEI Holdings, Inc.; and Adler & Shaykin, Defendants–Appellants.

No. 1707, Docket 95–7008.

United States Court of Appeals, Second Circuit.

Argued June 8, 1995.

Decided Sept. 13, 1995.

Philip K. Howard, New York City (Linda C. Goldstein, Howard, Darby & Levin, New York City, Judith L. Spanier, Abbey & Ellis, New York City, of counsel), for Plaintiffs–Appellees.

Dennis J. Block, New York City (Joseph S. Allerhand, Miranda S. Schiller, Howard L.

Kneller, Weil, Gotshal & Manges, New York City of counsel), for Defendants–Appellants.

Simon M. Lorne, General Counsel, Jacob H. Stillman, Assoc. Gen. Counsel, Susan S. McDonald, Special Counsel, Diane V. White, Senior Counsel, and Paul Gonson, Solicitor, Securities and Exchange Commission, Washington, DC, submitted a brief as amicus curiae for the Securities & Exchange Commission.

Before: OAKES, MINER, and LEVAL, Circuit Judges.

MINER, Circuit Judge:

Defendants-appellants appeal from an order entered on August 12, 1994 in the United States District Court for the Southern District of New York (Lowe, J.) denying, in part, defendants' motion for summary judgment, the court having determined, *inter alia*, that benefit-of-the-bargain damages are available to plaintiffs under section 11 of the Securities Act of 1933 (the "1933 Act") and under section 10 of the Securities Exchange Act of 1934 (the "1934 Act"), and that the no-action clause in the underlying indenture did not bar plaintiffs' federal securities law claims. The district court identified these issues as warranting interlocutory review and certified its order, pursuant to 28 U.S.C. § 1292(b). A panel of this Court granted defendants' motion for leave to appeal on January 3, 1995.[1]

For the following reasons, we affirm so much of the district court's order as allows plaintiffs to recover benefit-of-the-bargain damages under section 10 of the 1934 Act and as holds that the no-action clause in the underlying indenture does not bar plaintiffs' federal securities law claims. We reverse the district court's order to the extent that it allowed benefit-of-the-bargain damages under section 11 and refused to consider defendants' statutorily prescribed affirmative defense.

**BACKGROUND**

In July of 1986, defendant-appellant Wherehouse Entertainment, Inc. ("Where-

house") issued 6.25% Convertible Subordinated Debentures (the "Debentures") at $1,000 par value. Plaintiffs allege that one of the key selling features of the Debentures was the right of holders to tender the Debentures to Wherehouse in the case of certain triggering events that might endanger the value of the Debentures. One such triggering event would occur if Wherehouse "consolidate[d] or merge[d] . . . unless approved by a majority of the Independent Directors." "Independent Director" was defined in the offering materials as a director of the company who was not a recent employee but who either was a member of the board of directors on the date of the offering, or who subsequently was elected to the board by the then-Independent Directors.

On November 19, 1987, Shamrock Holdings, Inc. announced that it planned to commence a tender offer for Wherehouse's common stock. Subsequently, defendant Adler & Shaykin, an investment partnership, formed defendants WEI Acquisition Corp. and WEI Holdings, Inc., and submitted a bid for the Wherehouse stock. On December 20, 1987, the Board of Directors of Wherehouse unanimously approved, with one abstention, a merger with WEI Acquisition Corp. and WEI Holdings, Inc. The Board's approval of the merger was announced the following day, December 21, 1987. This news seemed to have a positive effect on the Debentures, which traded on the open market. The price of the Debentures went from 47% of par on the previous trading day, December 18, to 49% of par on the announcement date, December 21. On December 23, 1987, Wherehouse filed a Schedule 14D–9 with the Securities and Exchange Commission in which the company advised that the right to tender would not be triggered by the merger.

Despite the company's announcement, plaintiffs attempted to tender their Debentures to Wherehouse following the merger, seeking a redemption price of 106.25% of par, pursuant to the right to tender. Wherehouse refused to redeem the Debentures at this price, claiming that the right to tender had

---

**1.** Plaintiffs' cross-motion for leave to appeal the remaining issues decided by the district court in its August 12, 1994 order was denied by the panel, and we will not consider those issues.

not been triggered because the Board had approved the merger. Instead, all debentureholders were given the opportunity to tender their securities at 50.72% of par, which represented the Debentures' conversion value on the date preceding the merger. Also, pursuant to a "Supplemental Indenture," the debentureholders no longer had a right to convert the Debentures into common stock.

Based on the foregoing, plaintiffs commenced two separate actions (the "McMahan" action and the "Thompson" action), which ultimately were consolidated. Plaintiffs claim that they were misinformed about the true nature of the right to tender, that the right was illusory, and that the registration statements and the prospectus, as well as oral representations made in connection therewith, were materially misleading. They contend that the right was portrayed as valuable to debentureholders, creating a duty on the part of the "Independent Directors" to act in the debentureholders' interest. They allege federal securities claims arising under, *inter alia*, section 11 of the 1933 Act, 15 U.S.C. § 77k, for a misleading registration statement and under section 10 of the 1934 Act, 15 U.S.C. § 78j, for fraud in connection with a sale of securities.

In the McMahan action, defendants made a motion to dismiss, which later was converted into a motion for summary judgment. The district court, adopting the recommendation of the magistrate judge, granted summary judgment in favor of defendants and dismissed the complaint. We reversed that decision, finding that there was a genuine issue of material fact as to whether a reasonable investor could have been misled by the offering materials. *See McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 578 (2d Cir.1990) ("*McMahan I*"), cert. denied, 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991).

On remand, the defendants again moved for summary judgment. It is this second motion that gives rise to this appeal. As to the issues raised in this appeal, the district court denied defendants' motion, ruling, *inter alia*, that (1) the no-action clause in · the indenture did not operate to bar plaintiffs'

federal securities law claims; (2) plaintiffs may recover benefit-of-the-bargain damages under section 11 of the 1933 Act and section 10 of the 1934 Act. *See McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F.Supp. 743 (S.D.N.Y.1994). Subsequently, the court certified an order delineating these two rulings for an interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). A panel of this court granted leave to appeal on January 3, 1995.

## DISCUSSION

### I. Benefit–Of–The–Bargain Damages

Defendants contend that the district court erred in ruling that plaintiffs could recover benefit-of-the-bargain damages under section 11 of the 1933 Act and under section 10 of the 1934 Act. "Summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993). "We review a grant of summary judgment *de novo*." *Peoples Westchester Sav. Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir.1992). Each of defendants' claims will be discussed in turn.

### A. Section 11 of the 1933 Act

■ Section 11(a) of the 1933 Act imposes civil liability on issuers and other signatories of a registration statement if the registration statement contains material misstatements or omissions and the plaintiffs acquired the securities without knowledge of such misrepresentations. *See* 15 U.S.C. § 77k(a); *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 340 (2d Cir.1987); *see also Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 203 n. 9 (2d Cir.1980). Section 11(e) of the 1933 Act specifically provides the measure of damages in such suits:

The suit ... may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was

brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages [as calculated under subsection (1), above]. . . .

15 U.S.C. § 77k(e). While any decline in value is presumed to be caused by the misrepresentation in the registration statement, *see Greenapple*, 618 F.2d at 203 n. 9, section 11(e) provides the following affirmative defense:

> [I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from [the] part of the registration statement . . . [that contains the material misstatement or omission], such portion of or all such damages *shall not be recoverable.*

15 U.S.C. § 77k(e) (emphasis added). This defense is known as the defense of "negative causation." *See Akerman*, 810 F.2d at 340. Accordingly, where a defendant proves that the decline in the value of the security in question was not caused by the material omissions or misstatements in the registration statement, plaintiff is not entitled to recover any damages. *See id.*

■ Here, the district court erred in ruling that plaintiffs may recover benefit-of-the-bargain damages under section 11 and that the market value was "irrelevant to Plaintiffs' claimed economic losses." 859 F.Supp. at 751. "It is axiomatic that [t]he starting point in every case involving construction of a statute is the language itself." *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985) (internal quotations omitted). The plain language of section 11(e) prescribes the method of calculating damages, *see* 15 U.S.C. § 77k(e), and the court must apply that method in every case. *Cf. Versyss Inc. v. Coopers & Lybrand,* 982 F.2d 653, 657 (1st Cir.1992) (recognizing that, in general, section 11 should not be "extended beyond its normal reading"), *cert. denied,* —— U.S. ——,

113 S.Ct. 2965, 125 L.Ed.2d 665 (1993). Plaintiffs' claim that section 11(e), like section 11(g),[2] only provides a "cap" on damages, rather than the "measure" of damages, is belied by the plain language of the statute. Indeed, section 11(e) is entitled "Measure of damages," and the statutory scheme requires courts to apply the prescribed formula in every section 11 case. The record indicates that there was a substantial decline in the market price of the Debentures between the date plaintiffs purchased the Debentures and the date of the merger. This decline in market value permits plaintiffs to recover damages under the statutory scheme.

Defendants argue that the claim for damages under section 11 should be dismissed because they have established the defense of negative causation. The district court, however, ruled that negative causation was irrelevant to plaintiffs' section 11 claim in view of its determination that benefit-of-the-bargain damages were available and therefore failed to consider the defense. Because the plain language of section 11 allows this defense, the district court, on remand, must allow defendants the opportunity to prove that the decline in value was not caused by the alleged misstatements in the registration statements. *See Akerman,* 810 F.2d at 342. When considering defendants' defense, the district court should apply the following principles.

First, the term "value" in section 11(e) was intended to mean the security's true value after the alleged misrepresentations are made public. Even plaintiffs have suggested that damages be measured by the difference between the amount paid and the amount that defendants were willing to redeem the Debentures for after the merger was announced, i.e., the value of the Debentures after the alleged misrepresentations were disclosed. Accordingly, the district court's reference to "promised value" was misplaced because promised value is irrelevant to this calculation.

■ Second, the value of a security may not be equivalent to its market price. Con-

---

2. Section 11(g) provides that "[i]n no case shall the amount recoverable under [section 11] ex-

ceed the price at which the security was offered to the public." 15 U.S.C. § 77k(g).

gress' use of the term "value," as distinguished from the terms "amount paid" and "price" indicates that, under certain circumstances, the market price may not adequately reflect the security's value. *See Beecher v. Able,* 435 F.Supp. 397, 404–05 (S.D.N.Y.1977) (adjusting the market price to account for panic selling in the market that was unrelated to the misrepresentations in the registration statements); *Grossman v. Waste Management, Inc.,* 589 F.Supp. 395, 415–16 (N.D.Ill.1984) (holding that subsequent fraud on the market may make market price an unreliable indication of the security's value). However, instances where the market price of a security will be different from its value are "unusual and rare" situations. *In re Fortune Sys. Sec. Litig.,* 680 F.Supp. 1360, 1370 (N.D.Cal.1987). Indeed, in a market economy, when market value is available and reliable, "market value will always be the primary gauge of an enterprise's worth." *Mills v. Electric Auto–Lite Co.,* 552 F.2d 1239, 1247 (7th Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977). Moreover, even where market price is not completely reliable, it serves as a good starting point in determining value. *See Beecher,* 435 F.Supp. at 406. In this case, market price appears to be the most reliable gauge of the Debentures' true value and, at the very least, an excellent starting point. Thus, the district court, in applying the statutory damages formula, should begin with the market price to determine the true value of the Debentures.

■ Finally, as a general rule, a "price decline before disclosure may not be charged to defendants." *Akerman,* 810 F.2d at 342; *see also Feit v. Leasco Data Processing Equip. Corp.,* 332 F.Supp. 544, 586–88 (E.D.N.Y.1971). The defendant, however, bears the burden of proving that the price decline was not related to the misrepresentations in the registration statement. *See* 15 U.S.C. § 77k(e); *see also Akerman,* 810 F.2d at 340.

The district court should address these issues in the first instance, being most familiar with the circumstances of this case.

### B. Section 10 of the 1934 Act

■ Plaintiffs' section 10 claim for damages stands on a different footing. Section 28(a) of the 1934 Act provides that "no person permitted to maintain a suit for damages under the provisions of this chapter shall recover ... a total amount in excess of his actual damages on account of the act complained of." 15 U.S.C. § 78bb. The statute does not prescribe a particular method of calculating damages, and, in fact, we have allowed benefit-of-the-bargain damages under section 10, *id.* § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.

In *Osofsky v. Zipf,* 645 F.2d 107 (2d Cir. 1981), the plaintiffs were offered a specific price if they tendered their common stock in connection with a tender offer. Plaintiffs tendered their stock, but received a lesser amount than they originally had been offered. *Id.* at 109–10. We held that benefit-of-the-bargain damages, under Rule 10b–5, were particularly appropriate in the context of tender offers where, despite the fraud, the shareholders normally will receive an amount in excess of market value. *Id.* at 114. We noted that the key to awarding benefit-of-the-bargain damages is the degree of certainty to which they can be established. *Id.*

In *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir.1971) (Friendly, J.), the court stated that, under Rule 10b–5, a defrauded buyer of securities was "entitled to recover only the excess of what he paid over the value of what he got, not, as some other courts had held, the difference between the value of what he got and what it was represented he would be getting." In *Osofsky,* we noted that this language in *Levine* was dicta, and we distinguished *Levine* on the ground that damages sustained by a defrauded buyer of securities are more speculative and thus different from the damages of a defrauded seller who does not get what he was promised. *Osofsky,* 645 F.2d at 112. In cases following *Osofsky,* we have focused on the plaintiff's ability to establish benefit-of-the-bargain damages with some reasonable degree of certainty. For example, in *Barrows v. Forest Labs., Inc.,* 742 F.2d 54, 59–60 (2d Cir.1984), we refused to allow benefit-of-the-bargain damages

where such damages were based on the speculation of what plaintiff's securities would have been worth if the company had disclosed its true financial forecast. More recently, in *Commercial Union Assurance Co. v. Milken,* 17 F.3d 608, 614–15 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994), we acknowledged the possibility of awarding benefit-of-the-bargain damages in a Rule 10b–5 case, but declined to do so because the plaintiff's claims were speculative.

In this case, we believe that plaintiffs could establish benefit-of-the-bargain damages with reasonable certainty. We acknowledge, however, that this is not a case like *Osofsky,* where plaintiffs were offered a certain price during a tender offer and then received some lesser amount. In this case, plaintiffs purchased debentures, allegedly relying in part on the possibility that a merger that was not approved by the Independent Directors might occur and thus trigger the right to tender. This possibility, we have previously held, could reasonably be considered a "valuable right" to plaintiffs. *See McMahan I,* 900 F.2d at 579. Whether plaintiffs can establish, with a reasonable degree of certainty, the amount of that value is a different question.

Plaintiffs contend that determining damages in this case is a simple task—upon a merger, they are entitled to 106.25% of par for each Debenture. In reality, the matter is more complex than plaintiffs' contention would indicate. Because the value of plaintiffs' right to tender was contingent on the occurrence of certain events, the value of this right is somewhat speculative. Nevertheless, if plaintiffs could establish, under their theory of the case, that independent directors, acting on behalf of the debentureholders, would not have approved this merger, then

damages could be assessed at the promised redemption of par plus 6.25%.

## II. The No–Action Clause

■ Defendants contend that the district court erred in ruling, as a matter of law, that the no-action clause found in the Indenture cannot operate to waive plaintiffs' rights under the 1933 and 1934 Acts. The no-action clause is contained in section 8.06 of the Indenture and provides as follows:

> *Limitation on Suits.* A Securityholder may pursue any remedy with respect to this Indenture or the Securities only if:
>
> (1) the Holder gives to the [Indenture] Trustee written notice of a continuing Event of Default; [3]
>
> (2) the Holders of at least 25% in principal amount of the Securities make a written request to the Trustee to pursue the remedy;
>
> (3) such Holder or Holders offer to the Trustee indemnity satisfactory to the Trustee against any loss, liability or expense;
>
> (4) the Trustee does not comply with the request within 60 days after receipt of the request and the offer of indemnity; and
>
> (5) during such 60–day period the Holders of a majority in principal amount of the Securities do not give the Trustee a direction inconsistent with the request.

Section 14 of the Debentures states in relevant part: "Securityholders may not enforce the Indenture or the Securities except as provided in the Indenture." [4]

Such no-action clauses frequently are included in indentures to limit suits arising from those agreements. *See UPIC & Co. v. Kinder–Care Learning Ctrs., Inc.,* 793 F.Supp. 448, 454 (S.D.N.Y.1992) (citing American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions,* 232–34 (1971)). "These clauses are strictly construed," *Cruden v. Bank of New York,* 957

---

**3.** Section 8.01 of the Indenture states that an event of default occurs if, *inter alia,* "the Company defaults in the payment of the principal of any Security when the same becomes due and payable, whether at maturity, upon redemption or otherwise[, or] the Company fails to comply with any of its other agreements in the Securities or this Indenture."

**4.** Section 8.07 of the Indenture provides that debentureholders are excused from complying with the No–Action clause in suits based on nonpayment of principal and interest on or after the due dates expressed in the Debenture and in suits based on the right to convert a Debenture to common stock. This is a requirement of section 316(b) of the Trust Indenture Act, 15 U.S.C. § 77ppp(b).

F.2d 961, 968 (2d Cir.1992), and have been enforced in a variety of contexts in both federal and state courts, *see, e.g., Friedman v. Chesapeake and Ohio Ry. Co.,* 261 F.Supp. 728, 729–31 (S.D.N.Y.1966) (action to accelerate the time of payment on bonds), *aff'd,* 395 F.2d 663 (2d Cir.1968), *cert. denied,* 393 U.S. 1016, 89 S.Ct. 619, 21 L.Ed.2d 561 (1969); *Greene v. New York United Hotels, Inc.,* 236 A.D. 647, 260 N.Y.S. 405, 406–07 (1st Dep't 1932) (action based on non-payment of coupons on debenture bonds), *aff'd,* 261 N.Y. 698, 185 N.E. 798 (1933).

In this case, plaintiffs failed to comply with the no-action clause, and, as a result, the district court ruled that their state-law claims were barred. In regard to the federal securities law claims, however, the district court ruled that the no-action clause was inoperable because it infringed on plaintiffs' substantive rights under the securities laws. The court based its conclusion on the anti-waiver provisions of both the 1933 and 1934 Acts, which provide, in pertinent part, that "[a]ny condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of [the Acts or any rule or regulation of the Commission or an exchange] ... shall be void." 15 U.S.C. §§ 77n; *id.* § 78cc(a).

Defendants argue that the no-action clause does not constitute a "waiver," but, rather, establishes a procedure that must be followed before an action may be brought. They attempt to analogize the no-action clause to an arbitration clause, and claim that both merely are procedural limitations. We disagree.

Arbitration clauses are enforceable under federal securities laws because they are procedural in nature and do not serve to waive compliance with the provisions of substantive law. *See Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 238, 107 S.Ct. 2332, 2343–44, 96 L.Ed.2d 185 (1987) (stating that "the SEC has sufficient statutory authority to ensure that arbitration is adequate to vindicate Exchange Act rights"). The no-action clause in this case can operate to bar a minority plaintiff class from exercising its substantive rights under federal securities law upon the vote of a majority of the debentureholders. Further, a plaintiff's inability to indemnify the Trustee, as required by the no-action clause here, would bar that plaintiff from commencing a securities law claim. The statutory framework of the 1933 and 1934 Acts compels the conclusion that individual securityholders may not be forced to forego their rights under the federal securities laws due to a contract provision. *See Kusner v. First Pa. Corp.,* 531 F.2d 1234, 1239 (3rd Cir.1976) (finding no "authority for the proposition that a 'no action' provision in an indenture effectively bars a direct action based upon the federal securities laws"). Thus, the district court properly found that actions based on federal securities laws may not be precluded by the no-action clause.

## CONCLUSION

We affirm so much of the district court's order as determined that benefit-of-the-bargain damages are available under section 10 of the 1934 Act and as determined that the no-action provision in the Indenture could not bar plaintiffs' securities law claims. We reverse the district court's order to the extent that the court ruled that benefit-of-the-bargain damages were available under section 11 of the 1933 Act. On remand, the district court is to apply the measure of damages specifically provided under section 11(e) of the 1933 Act in accordance with this opinion.